UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
          v.                    )   CRIMINAL NO. 05-10262-PBS
                                )
SROUCH KHUT,                    )
          Defendant.            )
_____)

**MEMORANDUM AND ORDER**

June 4, 2007

Saris, U.S.D.J.

     Defendant Srouch Khut, charged with drug trafficking and firearms offenses, moves to suppress evidence seized on August 21, 2005 from a residence at 135 Cross Street in Lowell, Massachusetts.  The government witnesses were Detective William J. Samaras, Jr. and Sergeant James Trudell of the Lowell Police Department.  After a one-day evidentiary hearing and review of the briefs, the motion is **ALLOWED**.

**I. FINDINGS OF FACT**

**A.  The Backdrop**

     In February of 2005, a confidential source provided information to the Lowell Police Department that Sophoan Oung ("Hershey") and his brother, Sophanara Oung ("Bee"), were trafficking in cocaine in the Lowell area.  Working with local police, the Drug Enforcement Agency ("DEA") set up surveillance of the Oungs, and the federal court authorized wiretaps on both their cell phones.  The defendant, Srouch Khut, was a customer.

On the night of August 20, police learned over the wire that Bee had discovered undercover officers tailing his car after a drug buy.  The Oung brothers, who now suspected they were the target of an investigation, discussed fleeing and hiding or destroying evidence.  Hearing this over the wire, the police decided to truncate the investigation and intervene.  The police entered Hershey's girlfriend's house without a warrant.  In quick succession, Hershey and Bee were arrested and their apartment was entered and searched, again without a warrant.  Later, after search warrants had been obtained, police discovered firearms, ammunition, and substantial quantities of cocaine and cocaine base.  Detective Samaras participated in the takedown of the Oungs.[1]

**B.  134 Cross Street**

Earlier on August 20, before the events of the evening began to unfold, a confidential source ("CS") made plans with defendant Khut to purchase two ounces of cocaine the next day.  The CS had made six previous controlled buys from the defendant.  During one of these buys, the CS told police that Khut carried a gun and had mentioned that he (Khut) wasn't afraid to shoot someone.  The police were aware that the defendant had served time for armed home invasion and was heavily involved in local gang activity.

---

[1]This Court ruled on Hershey and Bee's motion to suppress evidence seized during these searches.  See United States v. Oung, 2007 US Dist. Lexis 28823 (D. Mass Apr. 19, 2007).  This discussion assumes familiarity with the facts of that decision.

Around noon on August 21, a Sunday, Detective Samaras had the CS attempt to contact Khut on his cell phone.  Khut did not answer and, unlike the previous buys, Khut did not return the calls within the hour.  Although Khut had not set a time for the sale, previous transactions had taken place in the early afternoon.  Samaras became worried that Khut had learned of the arrests of his cohorts and would attempt to flee.  Around 1 p.m., Samaras made the decision to go to 135 Cross Street, Unit 4 to arrest Khut.  The police did not know if Khut was in the apartment at the time, but he frequently stayed there, and five previous controlled buys had taken place in the apartment.  The police made no effort to get an arrest warrant.

Around 2 p.m., the police arrived at 135 Cross Street.  They wore raid vests and had their badges prominently displayed. Another resident let the team in through the apartment building's front door and into the common hallway.  The mail/call boxes listed a person by the name of Khut as residing in Unit 6.

The team immediately went to Unit 4 on the second floor of the building.  Lieutenant Richardson knocked and announced "Police" several times, but no one answered.  DEA Special Agent Christian Brackett then went upstairs to Unit 6, showed an unidentified individual Khut's picture, and asked if Khut lived in the unit.  The person stated that Khut lived downstairs, in

Unit 4, and that "he should be there now."[2]  Brackett yelled down to the police at the door, "He's home!"  The police continued knocking.

About a minute had passed from when the team first knocked and announced "Police" at Unit 4.  Concerned that the inhabitants would destroy drugs, arm themselves, or flee, the team rammed the door down, entered with guns drawn, and announced their presence. They came upon Khut and his girlfriend, Sambath **Chan**, asleep and undressed in the bedroom.  Eleven officers were in the apartment.

The police saw in plain view on the bedroom nightstand a small quantity of cocaine.  The officers confiscated the drugs, and performed a brief protective sweep.  Then, Detective Samaras left to obtain a search warrant for the premises.  When he returned with a warrant 2-3 hours later, the officers searched the apartment.  Ten small bags of crack cocaine were found in a cigarette box in the bedroom.

## II.  DISCUSSION

### A.  Warrantless Entry and Exigent Circumstances

"[T]he Constitution normally requires the police to obtain an arrest warrant before entering a person's home to make an arrest."  United States v. Beltran, 917 F.2d 641, 642 (1st Cir. 1990) (citing Payton v. New York, 445 U.S. 573, 590 (1980)).  A warrantless entry into a suspect's home is thus "presumptively

---

[2]The basis for the neighbor's belief that Khut was inside the apartment is unknown.

unreasonable." <u>United States v. Samboy</u>, 433 F.3d 154, 158 (1st Cir. 2005) (citing <u>Payton</u>, 445 U.S. at 586).   To overcome this presumption, the government must "prove that the initial search came within some recognized exception to the Fourth Amendment warrant requirement." <u>United States v. Tibolt</u>, 72 F.3d 965, 969 (1st Cir. 1995).   "The circumstances which excuse failure to obtain a warrant are 'few in number and carefully delineated.'" <u>United States v. Curzi</u>, 867 F.2d 36, 41 (1st Cir. 1989) (quoting <u>United States v. U.S. District Court</u>, 407 U.S. 297, 318 (1972)).

"Nevertheless, a warrantless entry into a person's dwelling may be permitted if 'exigent circumstances' arise." <u>Samboy</u>, 433 F.3d at 158.[3]   Although exigency determinations invariably are fact-intensive, exigent circumstances commonly include:

> (1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant.

<u>Tibolt</u>, 72 F.3d at 969 (citations, alterations and internal quotation marks omitted).   "To show exigent circumstances, the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" <u>Samboy</u>, 433 F.3d at 158 (quoting <u>Fletcher v. Town of Clinton</u>, 196 F.3d 41, 49 (1st Cir. 1999)).

---

[3]The parties agree that the government had probable cause to arrest Khut based on the previous controlled buys.

Further, "[p]roof of exigent circumstances 'should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects.'" Id. (citation omitted).  In evaluating a claimed exigency, a court's "inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." Tibolt, 72 F.3d at 969 (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)).  The government bears the "heavy burden" of proving exigent circumstances capable of overriding the Fourth Amendment's warrant requirement. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see Samboy, 433 F.3d at 158.

## B.  Manufactured Exigency

Moreover, "[c]ircumstances deliberately created by the police themselves cannot justify a warrantless search." United States v. Curzi, 867 F.2d 36, 43 n.6 (1st Cir. 1989); see United States v. Martins, 413 F.3d 139, 148 (1st Cir. 2005) ("[L]aw enforcement officers may not manipulate events to create an emergency and bootstrap that invented emergency into a justification for a warrantless entry of a person's home.").  One way in which officers impermissibly "manufacture" an exigency is by choosing not to procure a warrant for a "fully anticipated" search or entry. See Niro v. United States, 388 F.2d 535, 539-40 (1st Cir. 1968).  An assertion of exigent circumstances cannot "excuse the failure to secure a warrant when those circumstances

are created by government officials who unreasonably and
deliberately delay or avoid obtaining the warrant."   United
States v. Rengifo, 858 F.2d 800, 804 (1st Cir. 1988) (citations
omitted).

The First Circuit has made clear that "no exigent
circumstances exist when 'the police fully expect that they may
have to enter a home to make an arrest in the near future and . .
. they have more than enough time and knowledge to secure a
warrant."   Samboy, 433 F.3d at 159 (quoting Beltran, 917 F.2d at
643 (no exigent circumstances where police knew for approximately
three hours before they arrested the defendant that they were
likely to do so, had an adequate basis for obtaining a warrant,
and could have obtained one)); see also Curzi, 867 F.2d at 43
(where agents "set the timetable" for arrests, had two hours to
obtain a warrant but did not, and there was no specific evidence
that suspects had detected surveillance, exigent circumstances
were not present).

Courts must "distinguish between cases where exigent
circumstances arise naturally during a delay in obtaining a
warrant and those where officers have deliberately created the
exigent circumstances."   United States v. Maldonado, 472 F.3d
388, 396 (5th Cir. 2006).   Courts have stated that

> [i]n determining whether the exigent circumstances were
> manufactured by the agents, we must consider not only
> the motivation of the police in creating the exigency
> but also the reasonableness and propriety of the
> investigative tactics that generated the exigency.   We

look to whether (1) there was sufficient time to secure
a warrant; and (2) whether the exigency was created by
unreasonable law enforcement tactics.

Id.; see also Samboy, 433 F.3d at 159.  If the police have ample

time to procure a warrant and probable cause to do so, but

nevertheless choose to go without, they may not rely on exigent

circumstances of their own making to cure an otherwise

unconstitutional entry into a suspect's home.

## C.  135 Cross Street

Here, the police had a probable cause before August 20 to

arrest Khut because several controlled buys had taken place.

However, "[t]here is no legal rule requiring the police to seek a

warrant as soon as probable cause likely exists to seek a

warrant."  Samboy, 433 F.3d at 160.  Thus, the first question is

whether the government has proven that there were exigent

circumstances to justify a warrantless entry into the Cross

Street apartment to arrest the defendant when he did not answer

his cell phone for about an hour on August 21.

The government argues that it reasonably feared that Khut's

failure to return the CS's phone calls indicated that he had

learned of his cohorts' arrests the night before.  There is no

evidence from the wiretap that Khut knew about the arrest, and a

one-hour delay between the cell phone calls and the entry, while

worrisome, was not sufficient to create an exigency sufficient to

justify a warrantless incursion into Khut's home.  The evidence

was that prior transactions had occurred in the early afternoon

8

and it was still only 1:00 p.m.  See United States v. Torres, 274
F. Supp. 2d 146, 156 (D.R.I. 2003) (explaining that "'[i]n
narcotics cases in particular, [the First Circuit] and other
courts have consistently found exigent circumstances to exist
where there is specific evidence that a supplier of drugs has
either detected police surveillance, or is acting nervously, or
is expecting his confederate to return at a particular time and
would therefore likely flee or dispose of the evidence if his
arrested confederate did not return promptly'" (quoting United
States v. Hidalgo, 747 F. Supp. 818, 826 (D. Mass. 1990)
(collecting cases))).  To justify a warrantless entry, an
assertion of exigency must be grounded in "more than merely a
subjective fear by government agents" that, for example, a
defendant will flee or evidence will be lost.  Id. at 155; see
also United States v. Veillette, 778 F.2d 899, 902 (1st Cir.
1985) (directing courts to inquire, inter alia, "whether there is
a great likelihood that evidence will be destroyed if there is a
delay until a warrant can be obtained") (emphasis in original).
The police pressed the panic button prematurely.

     Next, the government argues that once the police announced
their presence and learned that Khut was inside Unit 4, they
reasonably feared that the defendant would destroy evidence.
However, investigating officers may not create exigent
circumstances by choosing not to get a warrant, making their
presence known by knocking-and-announcing, and then claiming that

a warrantless search is necessary to avoid destruction of evidence.  See United States v. Chambers, 395 F.3d 563, 566 (6th Cir. 2005) (no exigent circumstances where "warrantless entry became a foregone conclusion once officers knocked" on door of suspected meth lab without attempting to procure warrant beforehand); United States v. Richard, 994 F.2d 244, 249 (5th Cir. 1993) ("exigency" manufactured where agents only suspected defendant was in motel room, didn't know what evidence the room might contain, and the threat of destruction to evidence "did not arise until agents announced themselves" without first attempting to get a warrant).

True, courts have upheld the practice of "knock and talk" -- a tactic in which an officer knocks on a suspect's door, "identifies himself[,] asks to talk to the home occupant and then eventually requests permission to search the residence" -- as a legitimate means to obtain a suspect's consent to search.  United States v. Zertuche-Tobias, 953 F. Supp. 803, 829 (S.D.Tex. 1996); see United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005) (collecting "knock and talk" cases and noting that federal courts have recognized the practice as a reasonable investigative tool when officers seek to gain an occupant's consent to a search). Here, however, the government did not arrive at Mr. Khut's home for the purpose of initiating a "knock and talk" to gain consent to search; their intent was to arrest the defendant.  Thus, this is not a case in which the police lawfully approached a suspect's

10

door to perform a "knock and talk" investigation because they
lacked probable cause for a warrant, and only thereafter were
confronted by an exigency created by a suspect's own conduct.
See, e.g., United States v. Jones, 239 F.3d 716, 721 (5th Cir.
2001) (entry justified because officers did not create exigent
circumstance by initiating "knock and talk" investigation at
defendant's door where officer's had no probable cause to obtain
a warrant and gun evidence was in plain view to officers standing
at the door); United States v. Scroger, 98 F.3d 1256, 1260 (10th
Cir. 1996) (search justified because police did not create
exigency by knocking on the door of a suspected meth lab where
officers believed there was insufficient probable cause to obtain
a warrant and defendant greeted officers with a meth hot plate in
hand); United States v. Grissett, 925 F.2d 776, 778 (4th Cir.
1991) (search and seizure justified because officers did not
create exigency by approaching hotel room and identifying
themselves before the smell of marijuana indicated the presence
of drugs); see also United States v. Halliman, 923 F.2d 873, 878-
79 (D.C. Cir. 1991) (entry justified where, after knocking,
officer heard a toilet flush, creating reasonable likelihood that
drugs were being destroyed).

    The government emphasizes that the police did not know if
Khut was in the apartment prior to approaching the neighbor and,
on this view, that exigent circumstances did not arise until
after their suspicion of his presence inside the apartment was

confirmed.  However, the police had more than enough probable
cause to obtain a search warrant for the apartment because five
controlled buys had taken place at that location.  See United
States v. Materas, 2007 U.S. App. LEXIS 8226, at *11 (1st Cir.
2007) ("The controlled buy from [defendant at searched address]
alone provided sufficient probable cause for issuing the search
warrant. Common sense dictates that evidence of [defendant's]
possession could probably be found in the location where he sold
drugs [a few days previously].") (citation omitted); United
States v. Genao, 281 F.3d 305, 308 (1st Cir. 2002) (stating that
"a properly conducted controlled buy is formidable evidence to
support a search").  While the apartment was in his girlfriend's
name, the police knew Khut probably "lived there" and
occasionally sold drugs from the apartment.[4]  The fact that the
police harbored some doubt as to Khut's presence inside the
apartment prior to the neighbor's confirmation does not save
their search.

     The government alternatively argues that clerk-magistrates
at the Lowell District Court routinely refuse to issue arrest
warrants in drug cases and instruct police to make probable cause
drug arrests.  See Mass. Gen. Laws c. 94C, § 41 ("Section 41").[5]

_____

     [4]See Hearing Tr. 26:6-7 (Feb. 16. 2007) ("We believed he --
we knew he lived there, but I believe it was in his girlfriend's
name.")(statement of Det. Samaras).

     [5]Section 41(b) provides that a "police officer shall have
the authority to arrest without a warrant . . . any person who he
has probable cause to believe has committed or is committing"

The short answer is that the police twice within 24 hours received a search warrant from the Lowell Court within 2 to 3 hours of request.  I do not credit this testimony that the clerk would decline a request for an arrest warrant.  In any event, a clerks' practice does not trump the constitutional necessity of procuring a warrant where an officer anticipates an arrest in a dwelling.

Although the government relies on Section 41 to justify the warrantless entry into a dwelling, there is no caselaw to support this assertion.  The caselaw that does exist deals only with searches and arrests that occur in a car, out in the open, or in an airport.  <u>See, e.g.</u>, <u>Commonwealth v. Skea</u>, 470 N.E.2d 385, 398 (Mass. App. Ct. 1984) (automobile); <u>Commonwealth . Wooden</u>, 433 N.E.2d 1234, 1237-38 (Mass. App. Ct. 1982) (public space); <u>Commonwealth v. Duran</u>, 293 N.E.2d 285, 287-88 (Mass. 1973) (luggage searched at airport); <u>see also</u> <u>Commonwealth v. Douglas</u>, 503 N.E.2d 28, 30 (Mass. 1987) (rejecting argument that search warrant was not required to effect search incident to lawful arrest pursuant to Section 41); <u>Commonwealth v. Huffman</u>,414 N.E.2d 1032, 1035 (Mass. App. Ct. 1981) (explaining that Section 41 "cannot be relied on as a basis for entering without a warrant residential premises used by a suspect as his home").  It is well settled in Massachusetts that the government must possess a valid

---

listed felonies, including distribution of cocaine.

arrest warrant to enter a home.  <u>E.g.</u>, <u>Commonwealth v. Silva</u>, 802
N.E.2d 535, 539 (Mass. 2004) (citations omitted).  Any
construction of Section 41 which permitted warrantless entries
into homes to effectuate an arrest in a drug case would be
Paytonly unconstitutional.

Accordingly, the government has failed to meet its burden of
demonstrating a non-manufactured exigency capable of overriding
the Fourth Amendment's warrant requirement.  The defendant's
motion to suppress evidence seized at 135 Cross Street is
therefore **ALLOWED**.

## ORDER

Defendant's motion to suppress evidence (Docket No. 52) is
**ALLOWED**.

**S/PATTI B. SARIS**
United States District Judge